Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MONZER ERAKAT

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONZER ERAKAT, on behalf of himself and all similarly situated persons,<br><br>       Plaintiff,<br><br>v.<br><br>GOODRX, INC., a Delaware corporation,<br><br>       Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1. Plaintiff MONZER ERAKAT ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant GOODRX, INC., a Delaware corporation ("Defendant" or "GoodRx"), and alleges as follows:

## I.     NATURE OF THE ACTION

2. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.goodrx.com (the "Website"), a healthcare consumer website that Defendant provides for public access and use.

3. During his use of the Website, Plaintiff navigated to multiple pages addressing sensitive mental-health subject matter, including a page concerning the signs of depression in men and a page concerning the treatments for major depressive disorder, unaware that Defendant was causing and permitting third parties to intercept the contents of his communications and to associate those contents with persistent, cross-session user identifiers.

4. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing, the page titles identifying the subject matter of those pages, persistent identifiers tying those communications to Plaintiff across browsing sessions.

5. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' communications with the Website, capture page URLs and corresponding page titles, and transmit those contents alongside persistent user identifiers to the operators of those third-party tracking technologies for the third parties' own commercial purposes, including healthcare-vertical advertising and audience-data ecosystems.

6. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so for years, generating revenue from the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

surreptitious commercial exploitation of the contents of users' communications, including those of Plaintiff and the Class Members.

7.    Plaintiff personally used the Website during the class period and preserved an HTTP archive file (commonly known as a HAR file) of his own browsing session. Counsel caused a technical investigation to be conducted that replicated URLs and user flows presented in Plaintiff's HAR file and that documented the third-party tracking transmissions described in this Complaint.  The figures and screenshots reproduced below are from that investigation and are included herein as illustrative examples of how the Website's tracking technologies operated when Plaintiff visited the Website.

## II.    GENERAL ALLEGATIONS

8.    A web tracker is a tracking mechanism embedded in a website that monitors user interactions and transmits data to third-party servers. Trackers commonly take the form of small, transparent images, lightweight JavaScript files, software development kits ("SDKs"), or direct HTTP requests issued by the user's browser to third-party endpoints. Trackers operate automatically when a webpage loads, without requiring the user's knowledge or affirmative action.

9.    When triggered, trackers cause the user's browser to transmit data to third-party servers, including the contents of the user's communications with the host website such as page URLs identifying what the user is viewing, the corresponding page titles, and persistent identifiers that tie those communications to a particular user across browsing sessions.

10.    When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following (collectively, the "Trackers"):

- The DMD Healthcare Network Tracker;
- The comScore Tracker;
- The Google Analytics Tracker; and
- The Google Ads Tracker.

3

11. The third parties who operate the above-listed Trackers use the intercepted contents of users' communications collected via the Website for their own independent commercial purposes tied to broader healthcare-advertising and audience-data ecosystems, including healthcare-vertical audience identity resolution, audience segmentation, behavioral profiling, real-time ad targeting, and cross-site identity resolution.

12. The Trackers are operated by distinct third parties, including DMD Marketing Corporation (as to the DMD Tracker at aim-tag.hcn.health); Comscore, Inc., a registered California data broker (as to the comScore audience-measurement tracker at sb.scorecardresearch.com); and Google LLC (as to the Google Analytics 4 and Google Ads trackers at www.google-analytics.com and www.google.com). Each is an independent commercial actor that maintains its own infrastructure, controls its own platform, and processes data captured through the Trackers for its own purposes, separate from any service rendered to Defendant.

13. Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers during the page-load process. As a result, Defendant causes the browsers of California users, including Plaintiff and the Class Members, to transmit the contents of their communications with the Website, in real time and during the page-load process itself, to the third parties operating the Trackers.

14. The third-party tracking code executes contemporaneously with each page load initiated by Plaintiff's browser. The page-load process for a modern webpage is not a single instantaneous event; it consists of many successive steps that the browser performs in sequence and in parallel, including the initial HTTP request and response for the page URL, the parsing of the returned HTML markup, the fetching and execution of embedded scripts (including the Trackers), the fetching of stylesheets, images, fonts, and other linked resources, and the rendering of the page to the user. During that same page-load process, before the page-load process completes, the Trackers cause the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

browser to issue separate, parallel outbound requests to third-party endpoints carrying the contents of Plaintiff's communications with the Website and persistent identifiers tied to Plaintiff. The interception of Plaintiff's communications by the Trackers is contemporaneous with, and occurs during, the transmission of those communications to Defendant.

15. Technical analysis of the Website's tracker architecture confirms that, during the page-load process, the DMD Tracker dispatches an outbound POST request to aim-tag.hcn.health, the comScore Tracker dispatches an outbound request to sb.scorecardresearch.com, the Google Analytics 4 Tracker dispatches an outbound request to www.google-analytics.com/g/collect, and the Google Ads Tracker dispatches an outbound request to www.google.com/ccm/collect. Each of those tracker requests fires automatically, without any user interaction or affirmative action, and is dispatched during the page-load process before the page-load process completes, carrying the contents of the user's communications with the Website and persistent identifiers tied to the user.

16. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices, did not consent to the contents of their communications with the Website being transmitted to the third parties operating the Trackers, and did not consent to the use or commercial exploitation of those contents by Defendant or by the third parties.

17. Generalized references herein to users, visitors, and consumers expressly include Plaintiff and the Class Members.

### III.   PARTIES

18. Plaintiff MONZER ERAKAT is a California citizen residing in Solano County, California, and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred on or about May 27, 2026.

19. Defendant GoodRx, Inc. is a Delaware corporation with its principal place of business in Santa Monica, California. GoodRx owns, operates, and controls the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Website, www.goodrx.com, a healthcare consumer platform through which GoodRx publishes drug-pricing, condition, treatment, and other healthcare information to a national audience, including a significant audience of California users. GoodRx conducts healthcare-information and digital-services business nationwide and serves California users from the Website.

## IV.    JURISDICTION AND VENUE

20.    Defendant is subject to general personal jurisdiction in California because Defendant maintains its principal place of business in Santa Monica, California, and is at home in California for purposes of personal jurisdiction.

21.    Defendant is further subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10. Defendant has cultivated California as a significant market for its healthcare-information services, monetizes California users' engagement with the Website through the sale of advertising and the activation of audience data, and integrates third-party tracking technologies that transmit California users' communications to data infrastructure operated by California-headquartered companies, including Google LLC (Mountain View, California).

22.    Defendant's own published privacy disclosures confirm the conduct alleged herein. In its Privacy Policy, GoodRx acknowledges that "[o]ur URLs, pages, screens, and content may include drug names and information and condition names and information," and that "we and other companies may use this information to, among other things, provide the Services, help diagnose problems with our servers, analyze trends, track users' web page, email, and mobile application movements/activities, help identify or gather demographic information, and target and retarget online and mobile advertisements to you across computers or devices you may use."[1]

/ / /

---

[1] GoodRx Privacy Policy § 1 (Internet/Electronic Activity), can be found online at https://www.goodrx.com/privacy-policy (last visited June 18, 2026).

6

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

23.    GoodRx further acknowledges that "[w]e may use other companies' analytics, tracking and provided tools that receive information when you use our Services, including technology from Google, Facebook and others, to help us track, segment, and analyze usage of the Services, and to help us or those companies serve more targeted advertising on the Services and across the Internet," and that "[t]he companies may also combine information they collect from your interaction with the Services with information they collect from other sources."[2]

24.    In its California Consumer Privacy Notice, GoodRx admits that the disclosures it makes for targeted-advertising services "may be considered a 'sale' and 'share' of personal information," and that the categories of personal information it has "sold" and "shared" in the past twelve months include identifiers, internet or other electronic network activity information, geolocation information, inferences, and sensitive personal information.[3]

25.    In its Consumer Health Data Privacy Notice, GoodRx acknowledges that the information it collects includes "[i]nformation about your health-related conditions, symptoms, status, diagnoses, testing, or treatments," and "[i]nformation that could identify your attempt to seek health care services or information," and that such consumer health data may be used for "advertising and marketing of our Services and other products or services we believe you may find interesting, as well as advertising and marketing served by third parties on our websites and mobile applications or on third-party platforms."[4]

---

[2] GoodRx Privacy Policy § 1.B (Information We Collect Automatically – Third-Party Technologies), can be found online at https://www.goodrx.com/privacy-policy (last visited June 18, 2026).

[3] GoodRx California Consumer Privacy Notice (Categories of Personal Information We "Sell" or "Share"), can be found online at https://support.goodrx.com/hc/en-us/articles/4411678336539-California-Consumer-Privacy-Notice (last visited June 18, 2026).

[4] GoodRx Consumer Health Data Privacy Notice ("Consumer Health Data We Collect" and "Why We Collect and Use Consumer Health Data"), can be found online at https://support.goodrx.com/hc/en-us/articles/23203071323291-Consumer-Health-Data-Privacy-Notice (last visited June 18, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

26. Defendant's purposeful direction of its tracking infrastructure at California, its integration with California-headquartered Trackers, and its admissions in its own privacy disclosures are sufficient to support the exercise of personal jurisdiction in this District.

27. Plaintiff's claims arise out of and relate to Defendant's forum-related conduct. Plaintiff's communications were intercepted on his device in California, while Plaintiff was located in California, while Plaintiff was accessing the Website that Defendant operates from California, and while California-headquartered Trackers were caused to receive the contents of those communications and persistent identifiers tied to Plaintiff.

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a).

29. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

30. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed Class, and at least one member of the proposed Class is a citizen of a state different from Defendant.

31. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and has caused tortious injury in this District through the interception of California residents' electronic communications; (2) a substantial part of the events giving rise to the claims occurred in

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

this District, including the transmission of intercepted communications to California-headquartered Trackers operating in this District; and (3) Defendant is subject to personal jurisdiction in this District.

## V.    FEDERAL AND STATE PRIVACY LAWS

### 1.    The California Invasion of Privacy Act (CIPA)

32.    The California Invasion of Privacy Act ("CIPA") is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications.

33.    Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of electronic communications carried by wire, line, or cable.

34.    CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. The statute provides for civil enforcement by private litigants whose communications have been intercepted without their consent.

35.    Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

### 2.    The Federal Wiretap Act

36.    The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act ("ECPA") of 1986, prohibits the intentional interception of wire, oral, or electronic communications and provides a private right of action for individuals whose communications have been so intercepted.

37.    The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include the transfer

9

of signs, signals, writing, images, sounds, data, or intelligence transmitted by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

38.    A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater, plus punitive damages, equitable relief, and reasonable attorney's fees and costs.

## VI.    SPECIFIC ALLEGATIONS

39.    During his use of the Website, and as reflected in his HAR file, Plaintiff navigated to the following URLs, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://www.goodrx.com/conditions/depression/signs-of-depression-in-men; and

- https://www.goodrx.com/conditions/depression/guide-to-major-depressive-disorder-treatments.

40.    Plaintiff alleges on information and belief that the tracking mechanisms described below operated on the Website during Plaintiff's visit to the URLs identified above and intercepted the substantive contents of his communications with the Website. The figures reproduced below reflect independent technical analysis of the Website's tracker architecture and depict the same tracker conduct that Plaintiff alleges operated during his visit.

### 1.    The DMD Healthcare Network Tracker

41.    Defendant embedded and deployed a DMD Healthcare Network tracking mechanism on the Website.  The DMD mechanism fires automatically during the page-load process and transmits data to aim-tag.hcn.health, including the full page URL of the page being viewed, the corresponding page title, Plaintiff's geolocation at the city and ZIP-code level, and a bundle of persistent user identifiers that tie those transmissions to a particular user across browsing sessions.

10

42.    Figure 1 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to DMD during the load of www.goodrx.com/conditions/depression/signs-of-depression-in-men, the Website's article addressing the signs of depression in men. The request body contains the parameter clientRequestUrl set to the full URL of a sensitive mental-health article on the Website of the kind identified above; the parameter pageTitle set to the corresponding plain-text page title; geolocation fields identifying the user's state, ZIP code, and city; and a persistent DMD anonymous user identifier alongside a bundle of additional persistent identifiers forwarded into the same outbound request, including the Google Analytics identifier, the comScore first-party user identifier, a Segment anonymous identifier, a GoodRx unique identifier, an Optimizely end-user identifier, and DMD's own persistent dmd-tag identifier. The page URL, the corresponding page title, the user's geolocation, and the persistent identifier bundle all appear together in the same outbound request.

**Figure 1**

43.    DMD's servers at aim-tag.hcn.health returned responses to the DMD requests, including HTTP 200 OK responses, confirming that DMD received and

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

44.    DMD Marketing Corporation and its operators used the intercepted contents of Plaintiff's communications with the Website concerning sensitive mental-health subject matter, including the page URLs and the corresponding page titles, in conjunction with the persistent DMD anonymous user identifier and the bundle of additional persistent identifiers transmitted in the same request, for their own independent commercial purposes, including healthcare-vertical audience identity resolution, behavioral profiling, real-time targeting of healthcare advertising, and cross-session identity resolution.

45.    DMD Marketing Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the DMD Tracker on the Website.

### 2.    The comScore Tracker

46.    Defendant embedded and deployed a comScore tracking mechanism on the Website, operated by Comscore, Inc. through its audience-measurement platform. ComScore's own published documentation describes its asynchronous tag as "a script that uses a 'separate thread' to handle part of the processing of the webpage (so it will not hold up the loading of other elements on the page in the event that there is any latency in the tag loading)," and represents that the tag offers "[f]aster tracking code load times for your web pages due to improved browser execution."[5]

/ / /

_____

[5] Comscore, Distributed Content Tag Parameters (under "comScore Asynchronous Tag"), can be found online at https://direct-support.comscore.com/hc/en-us/articles/360006949974-Distributed-Content-Tag-Parameters (last visited June 18, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

47.    ComScore further explains that, on initial deployment of the comScore tag, "the user's machine will request the comScore beacon.js file," and that "[t]he beacon.js call then provides the required instruction set to the browser to fire the actual tag call."[6]

48.    ComScore's Distributed Content documentation likewise represents that "comScore's JavaScript is requested, automatically detecting a secure page, and automatically fires the tag based on the declared C parameters that are passed via query string."[7] The comScore mechanism fires automatically during the page-load process and transmits data to sb.scorecardresearch.com, including the full page URL of the page being viewed, the corresponding page title, and a persistent first-party user identifier.

49.    Figure 2 is a Fiddler Classic raw request capture showing an outbound request transmitted to comScore at sb.scorecardresearch.com/b during the load of www.goodrx.com/conditions/depression/signs-of-depression-in-men, the Website's article addressing the signs of depression in men. The request contains the query parameter c7 set to the full URL; the query parameter c8 set to the corresponding plain-text page title; and a persistent comScore first-party user identifier (cs_fpcu). The page URL, the corresponding page title, and the persistent identifier all appear together in the same outbound request.

/ / /

/ / /

[6] Comscore, How can I validate my tag is working as intended?, can be found online at https://direct-support.comscore.com/hc/en-us/articles/360002578333-How-can-I-validate-my-tag-is-working-as-intended (last visited June 18, 2026).

[7] Comscore, Distributed Content Tag Parameters (under "Usage summary"), can be found online at https://direct-support.comscore.com/hc/en-us/articles/360006949974-Distributed-Content-Tag-Parameters (last visited June 18, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2**



50.    ComScore's servers at sb.scorecardresearch.com returned responses to the comScore requests, including HTTP responses confirming that comScore received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

51.    Comscore, Inc. and its operators used the intercepted contents of Plaintiff's communications with the Website concerning sensitive mental-health subject matter, including the page URLs and the corresponding page titles, in conjunction with the persistent comScore first-party user identifier, for their own independent commercial purposes, including audience measurement, behavioral profiling, audience segmentation, and cross-session user identification.

52.    Comscore, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the comScore Tracker on the Website.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### 3.    *The Google Analytics Tracker*

53.    Defendant embedded and deployed a Google Analytics 4 tracking mechanism on the Website, operated by Google LLC through its analytics platform. Google's own published Google Analytics documentation states that "[w]henever someone loads a page of your website or their browser history state is changed by the active site, an enhanced measurement event called page_view is sent from your website to Google Analytics," and that since "the event is sent automatically, you don't need to send pageview data to Analytics manually."[8]

54.    Google further explains that the "default page_view event . . . is sent by the config command when the Google tag loads."[9] The Google Analytics 4 mechanism fires automatically during the page-load process and transmits data to www.google-analytics.com/g/collect, including the full page URL of the page being viewed (in the dl parameter), the corresponding page title (in the dt parameter), and persistent client and session identifiers that tie those transmissions to a particular user across browsing sessions.

55.    The Google Analytics 4 outbound request transmits the page URL, the corresponding page title, and the persistent client and session identifiers in the same outbound HTTP request to www.google-analytics.com/g/collect.

56.    Google LLC's Google Analytics servers at www.google-analytics.com returned responses to the Google Analytics requests, confirming that Google received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

/ / /

---

[8] Google, Measure pageviews, Google Analytics, can be found online at https://developers.google.com/analytics/devguides/collection/ga4/views (last visited June 18, 2026).

[9] Google, Measure pageviews, Google Analytics (under "Disable pageview measurement"), can be found online at https://developers.google.com/analytics/devguides/collection/ga4/views (last visited June 18, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

57.    Google LLC and its operators used the intercepted contents of Plaintiff's communications with the Website concerning sensitive mental-health subject matter, including the page URLs and the corresponding page titles, in conjunction with the persistent Google Analytics client and session identifiers, for their own independent commercial purposes, including audience analytics, audience segmentation, cross-product identity resolution within the Google advertising ecosystem, and activation against Google's advertising platforms.

58.    Google LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the Google Analytics Tracker on the Website.

### 4.    The Google Ads Tracker

59.    Defendant embedded and deployed a Google Ads tracking mechanism on the Website, operated by Google LLC through its advertising platform. Google's own published Google Ads documentation directs website operators to install the Google tag on every page of the website, loaded asynchronously, and represents that "[w]hen you've installed the Google tag, it will capture information about the pages viewed by your website visitors," and that "[t]his information includes the page URL and title."[10]

60.    Google further represents that "when a user lands on your site from an ad click, your Google tag for Google Ads conversion tracking will read the ad click information and send that information to Google Ads."[11] The Google Ads mechanism fires automatically during the page-load process and transmits data to www.google.com/ccm/collect, including the full page URL of the page being viewed, the corresponding page title, and a persistent Google Ads linker identifier that ties those transmissions to a particular user across browsing sessions.

[10] Google, Tag your website using Google Ads, can be found online at https://support.google.com/google-ads/answer/2476688 (last visited June 18, 2026).
[11] Google, Use the Google tag for Google Ads conversion tracking, can be found online at https://support.google.com/google-ads/answer/7548399 (last visited June 18, 2026).

61.     Figure 3 is a Fiddler Classic raw request capture showing an outbound request transmitted to Google Ads at www.google.com/ccm/collect during the load of the depression article referenced above. The request contains the query parameter dl set to the full page URL; the query parameter dt set to the corresponding plain-text page title; and a persistent Google Ads linker identifier. The page URL, the corresponding page title, and the persistent identifier all appear together in the same outbound request.

**Figure 3**



62.     Google LLC's Google Ads servers at www.google.com returned responses to the Google Ads requests, confirming that Google received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

63.     Google LLC and its operators used the intercepted contents of Plaintiff's communications with the Website concerning sensitive mental-health subject matter, including the page URLs and the corresponding page titles, in conjunction with the persistent Google Ads linker identifier,  for their own independent commercial purposes, including real-time ad targeting, audience segmentation, cross-site identity resolution,

and activation against the Google advertising ecosystem.

64. Google LLC, in its capacity as the operator of the Google Ads Tracker, is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the Google Ads Tracker on the Website.

### 5. Persistent Identifiers Stored in the Browser

65. Figure 4 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of the depression in men article. The Cookies panel reflects persistent cookies set by and tied to the Trackers, including the DMD dmd-tag cookie set on the .hcn.health domain with an expiration date approximately ten years in the future; the comScore UID cookie set on the .scorecardresearch.com domain with a persistence of approximately thirteen months; and Google identifier cookies tied to the Google Analytics and Google Ads platforms. These persistent cookies enable cross-session user tracking and behavioral profiling tied to the sensitive mental-health content being accessed on the Website.

**Figure 4**

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

66.     Figure 5 is a Chrome DevTools Application panel capture showing the browser's Local Storage during the load of the depression in men article. The Local Storage panel reflects additional persistent identifiers tied to the Trackers, including the Google Analytics client identifier (_ga) used to identify the browser across sessions for Google Analytics purposes. These Local Storage entries persist beyond browser sessions and supplement the persistent cookies depicted in Figure 4 in enabling long-term tracking capability independent of cookie expiration.

**Figure 5**



## VII.   CLASS ALLEGATIONS

67.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers between May 27, 2025 and the present.

68.     **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant. Joinder of all Class

19

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

69. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Defendant's conduct violates the California Constitution;
- Whether Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

70. **TYPICALITY:** As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members, who likewise had their URL contents intercepted by the Trackers and transmitted to third parties.

20

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

71. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially in conflict with those of the Class are excluded from the Class.

72. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not.

## VIII.  FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against Defendant

73. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

74. Plaintiff brings this cause of action on behalf of himself and the Class.

75. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state. The statute further prohibits aiding, agreeing with, employing, or conspiring with any person to do the same.

76. The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers intercepted those URL contents, paired them with persistent user identifiers in the same outbound requests, and transmitted them to third-party servers in real time and during the page-load process.

77. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL

contents for audience segmentation and ad targeting, and permitted the Trackers to use those URL contents for their own independent commercial purposes, all without Plaintiff's or Class members' knowledge or consent.

78. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and reasonable attorney's fees and costs.

## IX.   SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against Defendant

79. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80. Plaintiff brings this cause of action on behalf of himself and the Class.

81. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

82. The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' communications with the Website, including what they were viewing and what subject matter they were researching.

83. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use those URL contents for its own independent commercial purposes.

84. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the

22

interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, plus punitive damages, equitable relief, and reasonable attorney's fees and costs.

## X.      THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against Defendant

85.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86.     Plaintiff brings this cause of action on behalf of himself and the Class.

87.     California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

88.     Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a).

89.     Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers, including a healthcare-vertical adtech recipient (DMD Healthcare Network), for commercial monetization of sensitive mental-health-related content without disclosure, authorization, or compensation. The harm to Plaintiff and Class members substantially outweighs any utility of Defendant's conduct, the conduct is immoral, unethical, oppressive, and unscrupulous, and the conduct violates established public policy as reflected in the California Invasion of Privacy Act, the Federal Wiretap Act, Article I, Section 1 of the California Constitution, and the California Consumer Privacy Act's treatment of health-related information as sensitive personal information.

90.     Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific sensitive health content a user views, including browsing URLs of the kind intercepted

here, has recognized economic value in the digital advertising marketplace, and is treated as a high-value commercial asset by healthcare-vertical adtech recipients including the DMD Healthcare Network. Defendant and the Trackers monetized that data without compensating Plaintiff or the Class Members.

91. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are deemed unjustly enriched in the amount of that uncompensated transfer of value.

92. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees and costs.

## XI.   FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against Defendant

93. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94. Plaintiff brings this cause of action on behalf of himself and the Class.

95. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish (1) a legally protected privacy interest, (2) a reasonable expectation of privacy in the circumstances, and (3) conduct constituting a serious invasion of privacy.

96. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing of sensitive mental-health content. California law recognizes a substantial and heightened privacy interest in the substance of an individual's electronic communications about health, mental health, and other sensitive personal subject matter.

24

97. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a healthcare consumer website to read about depression and depression treatments does not expect that the specific URLs identifying the depression-related articles they read will be transmitted in real time to multiple third-party commercial entities, including a healthcare-vertical adtech network that ties those URLs to the user's ZIP code and city, and paired with persistent identifiers tying those communications to the user across browsing sessions.

98. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring four third-party tracking technologies on the Website, including a healthcare-vertical adtech network whose persistent identifier remains valid on the user's browser for approximately ten years, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications about sensitive mental-health subject matter, and caused those contents to be paired with persistent user identifiers and, in the case of the DMD Tracker, the user's geolocation, and transmitted to multiple third-party commercial entities for commercial exploitation.

99. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their sensitive mental-health browsing data.

## XII.  FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

100. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101. Plaintiff brings this cause of action on behalf of himself and the Class.

102. The common law tort of intrusion upon seclusion requires: (1) an

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

103.    Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding four third-party tracking technologies that intercepted the URL contents of those communications, paired those contents with persistent user identifiers (and, in the case of the DMD Tracker, the user's geolocation), and transmitted them to third-party commercial entities in real time and during the page-load process.

104.    The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific mental-health content Plaintiff was browsing and transmitted it to multiple third-party commercial entities,  including a healthcare-vertical adtech network that received the user's ZIP code and city alongside the mental-health article URL,  for healthcare-vertical advertising, audience segmentation, and broader commercial exploitation, all without disclosure or consent.

105.    As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their sensitive mental-health information. Plaintiff and the Class are entitled to compensatory and nominal damages.

## XIII.  SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against Defendant

106.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107.    Plaintiff brings this cause of action on behalf of himself and the Class.

108.    Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

26

109. Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website concerning sensitive mental-health subject matter, Defendant received monetary compensation and access to audience-targeting capabilities that supported the sale of advertising on the Website.

110. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data, particularly browsing data identifying sensitive mental-health content consumption, constitutes personal property with recognized economic value in the digital advertising marketplace, and is treated as a high-value commercial asset by healthcare-vertical adtech recipients. By intercepting and monetizing that data without disclosure or compensation, Defendant deprived Plaintiff and Class Members of the value of their browsing data.

111. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking conduct, and its failure to disclose the existence and operation of the Trackers in a manner that would permit informed consent, render its retention of the benefits unjust.

112. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.  **PRAYER FOR RELIEF**

113. WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against

intrusion upon seclusion and unjust enrichment;

3.  An order enjoining Defendant from continuing the conduct alleged herein;

4.  Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5.  Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6.  Punitive damages pursuant to 18 U.S.C. § 2520;

7.  Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8.  Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9.  Compensatory and nominal damages for intrusion upon seclusion;

10.  Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11.  Prejudgment interest;

12.  Reasonable attorney's fees and costs; and

13.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

114.  Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:  June 26, 2026      **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

/ / /

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED